In re WINSTAR COMMUNICATIONS, INC., et al., Debtors.

Equity Broadcasting Corporation, Plaintiff,

Myound Hwa Bae, Applicant for Intervention,

v.

Christice C. Shubert, Chapter 7 Trustee Winstar New Media Company, Inc. Winstar Credit Corporation Winstar Broadcasting Corporation, Defendants.

Bankruptcy No. 01–1430(JCA).
Adversary No. 02–04611.

United States Bankruptcy Court, D. Delaware.

Aug. 26, 2002.

---

Andrew H. Bart, Pryor, Cashman, Sherman & Flynn, LLP, New York City, Stephen M. Miller, Morris, James, Hitchens & Williams, LLP, Wilmington, DE, for EBC.

Nicholas J. Cremona, Kaye Scholer, LLP, New York City, Francis G.X. Pileggi, Fox, Rothschild, O'Brien & Frankel, LLP, Wilmington, DE, Christine C. Shubert, Tabernacle, NJ, for the Trustee.

Jeffrey C. Wisler, Connolly, Bove, Lodge & Hutz, LLP, Wilmington, DE, Scott A. Richie, Andrews & Kurth, L.L.P., Washington, DC, for Ms. Bae.

Donald Walton, Acting United States Trustee, Philadelphia, PA, for United States Trustee.

### Memorandum of Opinion
### on Jurisdiction

JOHN C. AKARD, Bankruptcy Judge.

This matter illustrates the problems that arise when a debtor and a related non-

debtor combine to enter into a transaction with a third party. Equity Broadcasting Corporation (EBC) brought this adversary proceeding against Winstar Broadcasting Corporation (WBC), which is not a debtor in the captioned bankruptcy case, and against Christine C. Shubert, the Trustee in Bankruptcy (Trustee) for Winstar Communications, Inc. (Communications) and two of its subsidiaries which are also in Chapter 7; Winstar New Media Company, Inc. (WNM) and Winstar Credit Corporation (WCC). The court finds that the complaint must be dismissed.[1]

## Discussion

In April 2001, Communications and several of its subsidiaries, including WNM and WCC, filed for relief under Chapter 11 of the Bankruptcy Code. The cases are jointly administered. Communications did not cause its wholly owned subsidiary, WBC, to file for Chapter 11 relief.[2]

### *Purchase Agreement*

In order to raise operating cash, Communications apparently found it necessary to sell various assets. The matter presently before the court arises out of a Purchase Agreement dated September 7, 2001 between EBC as purchaser and three sellers (Purchase Agreement) [The Purchase Agreement is attached to the Motion for Approval; Case Docket No. 954]. Two of the sellers are the Chapter 11 debtors,

WCC and WNM. The third seller is the non-debtor, WBC. Separate signature lines were provided for each of the sellers. In each instance, the agreement was signed by Timothy Graham, Vice President. The assets sold, as listed on Exhibit A to the Purchase Agreement, are 6 groups of notes and common stock issued by EBC. Item 1 is a note signed by EBC payable to WCC. Item 6 is 43,522 shares of EBC's common stock owned by WNM. Items 2–5 are notes signed by EBC payable to WBC and EBC stock owned by WBC. Those items are defined in the agreement as "Seller Securities." The purchase price is $20M (§ 1.02 of the Purchase Agreement). There is no allocation of the purchase price to the individual securities nor to the accompanying release. There is no allocation of the purchase price among the three sellers.

The release is first mentioned in § 1.01 of the Purchase Agreement, which reads:

SECTION 1.01 *Purchase and Sale of the Company Securities; and Release.* (a) At the Closing (as hereinafter defined), in accordance with Section 363 of The Bankruptcy Code, the Purchaser shall pay the Purchase Price (as defined below) and purchase and accept from the Sellers all of the Sellers' right, title and interest in and to the Seller Securi-

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(b), Order Transferring Case to Judge Katz dated January 17, 2002 [Case Docket No. 1876], and Order Transferring Case to Judge Akard dated March 15, 2002 [Case Docket No. 1919]. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. No evidence concerning this matter has been presented to the court. In argument, the parties have referred to WBC as "a wholly owned subsidiary," but have not specifically identified whether Communications or one of its subsidiaries owns the stock. No evidence has been presented concerning why WBC did

not file Chapter 11 along with the other entities related to Communications. Myoung Hwa Bae's Complaint in Intervention which is attached to her Motion for Leave to Intervene (Adversary Docket No. 13) states on "information and belief" that WBC was excluded "from the bankruptcy proceedings because, as a television broadcasting company, WBC's principal assets were interests in local stations and television permit rights issued by the Federal Communications Commission ('FCC'), which would be jeopardized if WBC sought bankruptcy protection." [Complaint, ¶ 14, page 4].

ties free and clear of any lien, interest, claim or encumbrance whatsoever, and upon receipt of the Purchase Price, the Seller shall sell, assign, transfer, convey and deliver to the Purchaser the Seller Securities. At the Closing, the Purchaser and Seller shall deliver to each other duly executed mutual releases in the form set out in Exhibit B hereto (the "Release")....

(c) It is a condition to the obligation of the Sellers to sell the Seller Securities to the Purchaser hereunder and that the Purchaser to Purchase the Seller Securities from the Sellers that the Purchaser and Sellers execute and deliver to each other the Release (for the avoidance of doubt, the releases contained in the Release shall be deemed to constitute part of the consideration for the sale of the Securities hereunder).

Subdivision (a) clearly states that the $20M purchase price was for the securities. Subdivision (b) makes the release a "condition" to the sale; that part is consistent with (a). The latter part of (b) is inconsistent by seeking to make the release additional consideration for the sale of the securities. The mutual releases contained in the Release Agreement provided sufficient consideration for the agreement.

The Purchase Agreement makes the sale subject to Bankruptcy Court approval and sets forth procedures for third parties to make higher bids if they wish to do so.

Pertinent to the current inquiry is § 3.07 of the Purchase Agreement which reads:

SECTION 3.07 *Governing Law; Venue and Jurisdiction.* This Agreement shall be governed by, and construed in accordance with, the law of the State of New York, regardless of the law that might otherwise govern under applicable principles of conflicts of law. Each par-

ty shall be deemed to have submitted to the non-exclusive jurisdiction of the courts (city, state and Federal) located in the County of New York, State of New York, for any action, proceeding or claim brought by any other party pursuant to this Agreement and waives any objection to the venue of any such suit, action or proceeding and the right to assert that such forum is not a convenient forum. To the extent that any action is brought against WNM and WCC under this Agreement, such action shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions. Service of process in any such action or proceeding brought against a party may be made by registered mail addressed to such party at the address set forth in Section 3.02.

Section 3.02 gives one set of three addresses (in care of Communications and two law firms) upon which notices to the Sellers are to be served. It does not make any distinction between the non-debtor WBC and the debtors WCC and WNM. In section 3.07 the parties agreed to an action in New York, but carefully (and properly) noted the jurisdiction of the Bankruptcy Court over WCC and WNM. Significantly, section 3.07 does not make any attempt to give the Bankruptcy Court jurisdiction over WBC. If, as EBC asserts, the Bankruptcy Court has jurisdiction over WBC, then most Section 3.07 would be meaningless.

*Release Agreement*

The same four parties entered in to a Release Agreement; also dated September 7, 2001 (Release Agreement) [the Release Agreement is attached to the Motion for Approval; Case Docket No. 954]. WBC, WNM, and WCC are defined as the Winstar Parties. Again, Timothy Graham signed the agreement as a Vice–President

of each of the Winstar Parties. The agreement recites that the parties are entering into the Purchase Agreement, that WCC and WNM are in Bankruptcy, that EBC and WBC have various claims against each other, and that the parties "desire to finally and irrevocably resolve any disputes that they have between them;" (Release Agreement, page 2). The Release Agreement is contingent on the closing of the Purchase Agreement. The Release Agreement contains a New York choice of law clause similar to that in the Purchase Agreement, but omits any reference to Bankruptcy Court jurisdiction.

The provisions of the Release Agreement that are pertinent to the current inquiry read as follows:

2. *Waiver of Certain of WBC's Rights.* WBC hereby releases EBC from all obligations to transfer to WBC six (6) low power television stations (the "LPTV Stations"), and waives its right to compel transfer of the LPTV Stations.[3]

3. *Release of EBC's Claims in WBC.* EBC hereby releases WBC from any and all claims it has, may have or will have against WBC, its affiliates, subsidiaries, heirs, successors and assigns relating to EBC's claims to interests in assets owned by WBC.

4. *Release of EBC's Claims in Economic Interests.* EBC waives any and all rights it has, may have or will have in the economic interests of all of WBC's assets, including without limitation, applications pending before the FCC respecting construction permits for broadcast television stations in Arcade, New York, Jackson, Mississippi, and Virginia Beach, Virginia (the "Pending Applications"). EBC agrees not to commit any act or omission that would be adverse to WBC's interests in the Pending Applica-

tions, including without limitation taking any position before the FCC or in any judicial proceeding that would adversely affect WBC's interests in the Pending Applications. Notwithstanding the foregoing, nothing contained in this Release Agreement shall affect EBC's rights in construction permits for television broadcast stations in Norman, Oklahoma, Provo, Utah(,) Kailua, Hawaii, Destin, Florida, and Tazwell, Tennessee that have been issued by the FCC to WBC that are in the process of being transferred to EBC (the "EBC Permits"). WBC agrees not to commit any act or omission that would be adverse to EBC's interests in the EBC Permits, including without limitation taking any position before the FCC or in any judicial proceeding that would adversely affect EBC's interests in the EBC Permits.

Paragraph 5 of the Release Agreement contains a general release of the Winstar parties. by EBC, The release in favor of EBC reads as follows:

6. *General Release of EBC.* Subject to Bankruptcy Court Approval, the Winstar Parties, their representatives, heirs, successors and assigns hereby release EBC and its affiliated, related, parent or subsidiary corporations, and its and their present and former directors, officers, and employees from all claims of any kind, know and unknown, which the Winstar Parties may now have or have ever had against any of them, or arising out of WBC's relationship with any of them, including, without limitation all claims relating to the matters related herein.

The first mention of WNM and WCC in the Release Agreement is in the preambles where they are named as parties to the

---

3. The six stations are not otherwise identified.

agreement and their Bankruptcy proceedings are described. The only other mention of them is paragraphs 5 and 6 (the mutual releases) where they are included as two of the Winstar Parties. The only substantive mention of the Bankruptcy court is in paragraph 6. Most of the provisions of the Release Agreement relate to releases of television station permits between EBC and WBC. As stated in paragraph 6, Bankruptcy court approval was needed for WNM and WCC to execute the release of EBC contemplated by that paragraph. Bankruptcy court approval was not needed for the other portions of the Release Agreement. Other than paragraph 6, none of the provisions of the release were subject to Bankruptcy court approval.

*Debtors' Motion for Approval*

"Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 363(b), 363(f) and 363(m) and Fed. R. Bankr.P. 9019(i) Approving Purchase Agreement with Equity Broadcasting Corporation, (ii) Authorizing Sale of Assets Free and Clear of Liens, Interests, Claims and Encumbrances, (iii) Authorizing the Release Agreement and (iv) Granting Related Relief" (Motion for Approval) is dated September 7, 2001 [Case Docket No. 954]. The preamble to the motion states that WNM and WCC request an order of the court:

(i) approving the Purchase Agreement among WNM, WCC and Winstar Broadcasting Corporation, an affiliate of the Debtors that is not a debtor in the above-captioned cases ("WBC" and along with WNM and WCC, the "Sellers"), as the sellers thereunder, and Equity Broadcasting Corporation ("EBC" or the "Purchaser") . . . (ii) authorizing the sale (the "Sale") of the debt and equity securities of EBC owned by WNM and WCC as described in the Purchase Agreement (the "Debtor Securities" and together with the debt an equity securities owned by WBC, the "Securities") free and clear of all liens, interests, claims and encumbrances, (iii) approving the Release Agreement by and between WCC, WNM, WBC and EBC in the form attached hereto as Exhibit B (the "Release Agreement") and (iv) granting related relief.

[Motion for Approval, pages 1 and 2]. Other pertinent portions of the motion read as follows:

10. The Debtor's (sic) business plan requires the Debtors and certain of their non-debtor affiliates (collectively, the "Company") to sell the Company's investments in EBC, including the Securities, as a means of raising capital. . . .

13. In addition to these efforts, the Company engaged in discussions with EBC in an attempt to settle certain outstanding disputes between WBC and EBC. . . .

14. The terms of EBC's settlement proposal are embodied in both the Purchase Agreement and the Release Agreement. Among other things, the Release Agreement provides for the release by the Purchaser of any claims that it has against the Company, including its claim to certain economic interest in the assets owned by WBC, and the release by the Sellers of any and all claims they may have against the purchaser, including WBC's right, which is disputed by EBC, to receive six television stations, which the Debtors' estimate to be worth approximately $2 million. Although the Debtors are not aware of any claims that EBC has or may have against the Debtor entities, the Release Agreement has been fashioned as a mutual general release by and between all parties to the Purchase

Agreement so as to achieve finality with respect to the parties' relationship. . . .

22. A significant part of the transactions described herein involve WBC, a non-debtor affiliate of the Debtors. . . . Accordingly, the Debtors only seek approval of the Purchase Agreement with respect to the Sale by WNM and WCC, and do not seek approval of the Release Agreement. . . .

24. By this Motion, the Debtors seek entry of an order . . . authorizing and approving the terms and conditions of the Purchase Agreement between the Sellers and the Purchaser . . . (ii) authorizing the Sale in accordance with the terms of the Purchase Agreement and the bidding procedures set forth herein, free and clear of all liens, claims, interests and encumbrances whatsoever, including but not limited to, the claims of secured or unsecured creditors of the Debtors or any other person, party or entity (collectively, the "Encumbrances"), with all Encumbrances to attach to the proceeds of sale, . . . and (iv) authorizing and approving the settlement between the Sellers and the Purchaser on the terms and condition of the Release Agreement.

The motion was signed by the "Attorneys for Debtors and Debtors in Possession" and "Special Counsel to Debtors and Debtors in Possession." It was not signed by anyone on behalf of WBC. Just as in the Purchase Agreement, the Motion for Approval did not assign values to the various items sold or to the Release Agreement nor allocate the purchase price among WBC, WNM and WCC.

While some phrases in the Motion for Approval might be construed as asking the court to approve a sale by WBC or otherwise exercise jurisdiction over WBC, taken as a whole, the Motion for Approval was only asking the court to approve the actions of the two debtors, WNM and WCC.

*Sale Order*

The Honorable Joseph J. Farnan, Jr., United States District Judge, was presiding over this Bankruptcy case at the time the Motion for Approval was presented for consideration. Apparently there were no competing bids for the assets in question. Judge Farnan's September 20, 2001 order [Case Docket No. 1048] is entitled: "Order Pursuant to Bankruptcy Code Section 363(b), 363(f) and 363(m) and Fed. R. Bankr.P. 9019(i) Approving Purchase Agreement with Equity Broadcasting Corporation, (ii) Authorizing sale of Assets Free and Clear of Liens, Interests, Claims and Encumbrances, (iii) Authorizing the Release Agreement and (iv) Granting Related Relief" (Sale Order). The preamble reads basically the same as the preamble to the Motion for Approval, including noting that it is brought by the Debtors, WNM and WCC, and referring collectively to WBC, WNM and WCC as the "Sellers." It states that the Motion for Approval requests an order of the court:

(ii) authorizing the sale (the "Sale") of certain debt and equity securities of EBC owned by WNM and WCC as described in the Purchase Agreement (the "Debtor Securities") free and clear of all liens, claims and encumbrances, (iii) approving the Release Agreement by and between WCC, WNM, WBC and EBC in the form attached to the Motion [for Approval] as Exhibit B (the "Release Agreement")

[Sale Order, pages 1 and 2]. The preamble also notes the filing of the Motion for Approval, the notice of the motion, a declaration in support of the motion by the Debtors' financial advisors and finds that "approval of the Sale of the Debtor Securities is in the best interests of the Debtors,

their estates, creditors, and other parties in interest . . . " [Sale Order, page 2].

In paragraph A. of the Sale Order the court notes that it has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. With a few exceptions, 28 U.S.C. § 1334 confers "original and exclusive jurisdiction of all cases under title 11" [4] on the United States District Courts. The District Court is permitted to refer Bankruptcy cases to Bankruptcy judges by 28 U.S.C. § 157. Thus the District Court was acting solely in its Bankruptcy jurisdiction and not exercising any other jurisdiction that might possibly give it jurisdiction over WBC.

In paragraph B. the court states that: "The statutory predicates for the relief requested in the Motion [for Approval] are sections 363(b), 363(f) and 363(m) of the Bankruptcy Code and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure." The title of § 363 [5] is "Use, sale, or lease of property." Section 363(b) allows the trustee or debtor in possession [6] to sell property of the estate in other than the ordinary course of business after appropriate notice and hearing. Section 363(f) provides that the sale of property by the trustee or debtor in possession under § 363(b) may be free and clear of any interest in such property of an entity other than the estate if certain requirements are met. The requirements for staying an order of sale while the matter is on appeal are contained in § 363(m). Federal Rule of Bankruptcy Procedure 6004 describes the notice that must be given before the

court can consider a motion to sell property of the estate. Rule 9019 describes the notice that must be given before the court can consider an application to compromise a controversy. Thus the District Court was only considering this matter under statutes and rules governing the sale of property by debtors in possession; namely WNM and WCC. The Sale Order does not cite any statute that would indicate the court was attempting to exercise jurisdiction over WBC.

In paragraph E. the court finds that: "The Debtors have demonstrated sound business justifications for the Sale and the related transactions pursuant to Section 363(b) of the Bankruptcy Code and the settlement contemplated by the Release Agreement pursuant to Rule 9019 of the Bankruptcy Code."

In paragraph J. the court finds that: "The Debtors may sell the Debtor Securities free and clear of all Encumbrances [7] of any kind or nature whatsoever because, in each case one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied."

Following the findings described above, the Sale Order contains numbered ordering paragraphs. Using those numbers, the court will point out the provisions that have a bearing on the present matter:

4. The court approves the Purchase Agreement "and all of the terms and conditions thereof."

---

4. Title 11 of the United States Code is the Bankruptcy Code.

5. The Bankruptcy Code is 11 U.S.C. § 101 *et seq*. References to section numbers are to sections of the Bankruptcy Code unless otherwise identified.

6. Section 1107 gives a debtor in possession under Chapter 11 the rights, powers, and

duties of a trustee (with certain exceptions which are not involved in this matter). A debtor becomes a debtor in possession upon the filing of a Chapter 11 case. § 1101.

7. The Sale Order provides that terms not defined in the order shall have the meanings ascribed to them in the Motion for Approval. [Sale Order, page 1]

5. The court approves the Release Agreement "and all of the terms and conditions thereof."

6. "Pursuant to section 363(b) of the Bankruptcy Code, the **Debtors** are authorized and directed to consummate the Sale of the **Debtor Securities,** pursuant to and in accordance with the terms and conditions of the Purchase Agreement." [Emphasis added]

8. "Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Sale Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtor Securities shall be transferred to the Purchaser pursuant to the Purchase Agreement and, as of the Closing Date, shall be free and clear of all Encumbrances of any kind or nature whatsoever, with all such Encumbrances of any kind or nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the, (sic) subject to any claims and defenses the Debtors, and other parties may possess with respect thereto.

12. "This Court retains jurisdiction to endorse (sic) and implement the terms and provisions of the Purchase Agreement·and the Release Agreements, (sic) all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Debtor Securities to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations **owed to the Debtors,** (c) resolve any disputes arising under or related to the Purchase Agreement or the Release Agreements (sic) **involving the Debtors,** except as otherwise provided therein, and (d) interpret, implement, and enforce the provisions of this Sale Order. [Emphasis added]

14. "The terms and provisions of the Purchase Agreement, the Release Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Purchaser, and their respective affiliates, successors and assigns and any affected third parties (including, but not limited to, all persons asserting Encumbrances in the Debtor Securities to be sold to the Purchaser pursuant to the Purchase Agreement), notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding."

The only mention of WBC in the Sale Order is in the definition of the word "Sellers" in the preamble. Although defined, the word Sellers is never used again in the Sale Order. Throughout the Sale Order, the District Court carefully used the terms "Debtors" and "Debtor Securities." The Release Agreement is approved, but the Debtors, WNM and WCC, were parties to that, so court approval of their execution of that agreement was required. There is nothing in the Sale Order to indicate that the court was approving WBC's transactions in the Purchase Agreement or the Release Agreement. Although some of the language of the Sale Order is broad, taken as a whole, the Sale Order shows that the District Court was only concerned with, and only exercising jurisdiction over, the Debtors, WNM and WCC. The District Court was not attempting to, and did not, exercise jurisdiction over WBC.

### Conversion to Chapter 7

On January 24, 2002, the Chapter 11 cases of Communications and the related

cases that were being jointly administered with it (including WNM and WCC) were converted to a liquidation under Chapter 7 of the Bankruptcy Code [Case Docket No. 1919]. Ms. Shubert was appointed the Chapter 7 Trustee in all of the cases.

### EBC's Complaint

EBC filed this adversary seeking to compel "transfer to EBC WBC's membership interests in five construction permits issued by the Federal Communications Commission ('FCC') for television broadcast rights (the 'EBC Permits')." [EBC Complaint ¶ 2, page 2. The Complaint is Adversary Docket No. 1].[8] The Trustee sought court approval of a Stipulation settling the adversary proceeding. The court conveyed to the parties its concerns about whether this court had jurisdiction in this matter. A hearing was held on August 14, 2002. Attorneys for EBC and Ms. Bae were heard. The Trustee participated in the hearing through her attorneys. EBC's certificate of service indicates service on WBC through its registered agent, but WBC made no appearance.

The court will discuss the salient points of EBC's Complaint.

EBC's Complaint contains four claims for relief, namely, specific performance, civil contempt, an accounting for revenues from the television broadcast rights from September 7, 2001 (the date of the Release Agreement) to date, and an injunction to enjoin the Defendants from disbursing any proceeds from those broadcast rights.

■ EBC contends: "Pursuant to the Sale Order, Debtors and WBC were ordered to transfer" to EBC what it refers to as the EBC Permits. **That statement is not correct.** The Sale Order makes no mention of television broadcast rights or permits nor does it order WBC to do anything. The Sale Order instructs the Debtors to transfer the Debtor Securities to EBC but it does not order the Debtors to transfer any broadcast rights or permits to EBC.

The only mention of television stations or permits is in paragraphs 2 and 4 of the Release Agreement that are quoted above. A careful reading of those sections shows that they only relate to WBC and EBC. There is no mention of the Debtors, WNM or WCC, in either paragraph. Neither of those paragraphs contain an express agreement on the part of WBC to transfer anything. The closest reference is the statement that certain permits "have been issued by the FCC to WBC that are in the process of being transferred to EBC ..." [Release Agreement, paragraph 4]. WBC agrees only "not to commit any act or omission that would be adverse to EBC's interests ..." [Release Agreement, paragraph 4].

The fact that paragraph 5 of the Sale Order, quoted above, approved the Release Agreement, does not support EBC's arguments. Paragraphs 5 and 6 of the Release Agreement, noted above, relate to the "Winstar parties" which include the Debtors, WNM and WCC. Because the Debtors are parties to those paragraphs of the agreement, court approval of the Release Agreement was required. There is no indication in the Sale Order that the court was attempting to order WBC to do anything.

---

8. There is no evidence as to what, if anything, WBC owns. The Release Agreement refers to "construction permits for broadcasting stations." [paragraph 4]. EBC's Complaint refers to permits [paragraph 18] and to limited liability companies [paragraphs 24 and 26]. In argument the Trustee's counsel stated: "As far as the FCC is concerned, the Trustee owns the permits," but later in argument asserted that the permits are owned by limited liability companies.

In argument, EBC's attorney attempted to separate paragraph 12 of the Sale Order into two portions. He suggested that the first part of that paragraph, being general, applied to WBC and that the latter part starting with the phrase "including, but not limited to" was limited to the Debtors by the specific mention of Debtors. The court does not agree. The entirety of paragraph 12, like the entirety of the Sale Order, relates only to the Debtors.

■ EBC's counsel suggests that WBC consented to the jurisdiction of the court by entering into the Sale Agreement and the Release Agreement. This argument fails for two reasons. First, there is no evidence that WBC consented to the jurisdiction of the court. WBC did not sign the Motion for Approval and there is no evidence that it was represented at the hearing where the court considered the sale. Secondly, and most importantly, jurisdiction cannot be conferred by consent. "Subject matter jurisdiction cannot be conferred upon the bankruptcy courts by consent of the parties." *Uranga v. Geib (In the Matter of Paso Del Norte Oil Co.)*, 755 F.2d 421 at 425 (5th Cir.1985).

In argument EBC asserted that this court has jurisdiction of this matter through the "related to" jurisdiction provisions of 28 U.S.C. § 1334(b) which reads:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

■ The leading case on this issue is *Pacor v. Higgins*, 743 F.2d 984 (3rd Cir. 1984). That case has been widely cited, including being cited with approval by the Supreme Court in *Celotex v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). The *Pacor* court stated:

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* ... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

On the other hand, the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1471(b).[9] Judicial economy itself does not justify federal jurisdiction.... Jurisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy does not exist.

*Pacor*, 743 F.2d at 994. [Emphasis in original. Citations and internal quotations omitted.]

■ There is no evidence as to the ownership of WBC. Trustee's counsel asserts that the Trustee owns all the stock in WBC. EBC's Complaint asserts that WBC is a wholly owned subsidiary of WNM. For purposes of this opinion, the court will assume that the Trustee owns all the stock of WBC, whether it is a subsidiary of WNM or of another corporation of which she is the Trustee. Does making that assumption then bring EBC's Complaint

**9.** The section has been renumbered to     1334(b).

under the jurisdiction of the Bankruptcy Court? Does this action alter the Bankruptcy estate's "right, liabilities, options, or freedom of action (either positively or negatively)"? EBC's action may have an effect on the ultimate value with the estate receives for the stock it owns, but it does not alter the estate's rights, liabilities, options or freedom of action. If the court were to find that this action was under the jurisdiction of the Bankruptcy Court, the decision would have the result of bringing every wholly owned subsidiary into every Bankruptcy case regardless of the circumstances and without the safeguards afforded by schedules, statements of financial affairs, notices to creditors, or meetings of creditors. Further, such a decision could result in debtors and others abusing the system by withholding from Bankruptcy or bringing into Bankruptcy subsidiaries in a revolving door fashion. Therefore, the court finds that the ownership of all of the outstanding stock of WBC by the Trustee does not confer jurisdiction on the Bankruptcy Court to decide disputes involving WBC's assets.

*Stipulation*

■ In an attempt to settle the adversary proceeding, the Trustee entered into a Stipulation with EBC [Adversary Docket No. 25]. In the Stipulation the Trustee acted on behalf of WNM, WCC, and WBC. The Trustee agreed to transfer to EBC "WBC's limited liability company ('LLC') membership interests in five television broadcasting permit sites, including (1) Norman, Oklahoma; (2) Provo, Utah; (3) Kailua, Hawaii; (4) Destin, Florida; and (5) Tazewell, Tennessee ..." [Stipulation, paragraph 1 pages 1 and 2]. The agreement was conditioned upon the court establishing a procedure for noticing other members of the LLCs and "any co-applicant to the Destin, Florida site." [Stipulation, paragraph 2, page 2]. If, as a result of the notices, any of the sites are sold to third parties, the consideration received is to be paid to EBC.

The Trustee did not personally sign the Stipulation. The Trustee was not present at the hearing on this matter. Her attorney reported that she was "out of the country." At a prior hearing, the Trustee stated that she controlled WBC because she "owned all the stock." At this hearing, her attorney stated: "As far as the FCC is concerned, the Trustee owns the permits." When questioned by the court about WBC's ownership, he stated that the Trustee owned all the stock, the corporation was a "shell" without officers [10], and that it was the Trustee's plan to liquidate the assets of WBC and "upstream" the proceeds to the Bankruptcy estates.

No evidence concerning the assets or liabilities of WBC was presented. The terms of the Release Agreement indicate that there are some assets. The Motion to Intervene described below indicates that WBC has debts. Under these circumstances, the Trustee cannot ignore WBC's corporate structure or the fact that it is **not** in a Bankruptcy proceeding. She can exercise her rights as the sole shareholder, but she cannot deal with the assets of WBC as she wishes. The corporate formalities must be observed.[11]

---

**10.** The Trustee's attorney offered no information concerning the resignation of Timothy Graham who signed the Purchase Agreement and the Release Agreement on behalf of WBC. In answering the court's questions the Trustee's attorney looked to the back of the room as if to secure verification of his statements from someone sitting there.

**11.** At a prior hearing, the Trustee stated that she is licensed to practice law in New Jersey and Pennsylvania. It is difficult to understand how someone with a law license would

In the Stipulation, the Trustee is attempting to convey assets of WBC. There does not appear to be any reason why, as Trustee of WNM and WCC, she should enter into the Stipulation. It does not concern any assets of those corporations and being Trustee for those corporations does not give her any right to convey WBC's assets.

For these reasons, the court will not approve the Stipulation and order that it be set aside.

### Motion for Leave to Intervene

Myoung Haw Bae filed a Motion for Leave to Intervene (Motion to Intervene) [Adversary Docket No. 18]. At hearing, the court tentatively allowed the Motion to Intervene so the court could understand the positions of all parties. Her motion states that on May 14, 2002 Ms. Bae received a judgment in the United States District Court for the District of Columbia against WBC for $500,000 plus interest, costs and attorney's fees. She acknowledges that the judgment is on appeal.[12] The judgment is an indication that WBC is more than a shell and that WBC may owe substantial sums to its creditors whose rights would be superior to those of the sole shareholder. This revelation supports the court's conclusion that the Trustee, as the sole shareholder of WBC, cannot personally deal with WBC's assets.[13]

Ms. Bae's claim is against WBC. In view of this court's finding that it has no jurisdiction over WBC, her Motion to Intervene must be denied, without prejudice to her right to pursue her claims against WBC in other forums.

### Motion to Compel

About the same time EBC filed this adversary proceeding, it filed in the main case a Motion to Compel Compliance with Court's Previous Order and for Civil Contempt Damages (Motion to Compel) [Case Docket No. 2674]. The motion requested basically the same relief as requested in this adversary proceeding. Accordingly, the Motion to Compel will be denied.

### Conclusions

Bankruptcy court jurisdiction is not a water fountain that can be turned on and off to suit the debtor's, the trustee's or a creditor's advantage at the particular moment. Either WBC is under the jurisdiction of the Bankruptcy court, or it is not.[14] WBC did not file for Bankruptcy relief when many of its sister corporations did. To this date, WBC has not filed for Bankruptcy relief and there is no indication of an involuntary Bankruptcy proceeding against it. Contrary to EBC's assertions, WBC did not consent to Bankruptcy court jurisdiction in connection with the Sale Order, and in the Sale Order the District Court made no attempt to assert jurisdiction over WBC. Since WBC is not in Bankruptcy, the Trustee, as its sole shareholder, has no right to enter into transactions on behalf of WBC or to deal in its assets. This court has no jurisdiction over WBC. Therefore (1) EBC's complaint in this ad-

assert that ownership of all of the stock of a corporation would, without more, give the owner the right to deal in the assets of the corporation.

12. There is no indication that the Trustee appeared in that suit nor the appeal. Such failure to act would seem to contradict her position that, as the sole shareholder, she controlled WBC.

13. It appears that if WBC were to file a Bankruptcy that Ms. Shubert could not be the trustee because of conflicts between the two estates.

14. As Bankruptcy Judge Frank Monroe of the Western District of Texas said in one case: "Bankruptcy is not a place to put your toe into the water to see if you like it. You are either all the way in or all the way out."

versary proceeding and its Motion to Compel in the main case will be denied, (2) the Trustee's stipulation with EBC will be set aside, and (3) Ms. Bae's Motion to Intervene will be denied.

Orders Accordingly.[15]

---

15. This Memorandum shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052. This memorandum will be published.